UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| BIEL LOANCO III-A, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-2518-STA-dkv |
| | ) | |
| EDWARD A. LABRY, III, WILLIAM B. | ) | |
| BENTON, JR., and J. KEVIN ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## ORDER GRANTING PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT
_____

Before the Court is Plaintiff's Second Motion for Summary Judgment (D.E. # 44), filed on July 27, 2011. Defendants Edward A. Labry, III ("Labry"), William B. Benton, Jr. ("Benton") and J. Kevin Adams ("Adams") (collectively "Defendants") filed their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on September 12, 2011. (D.E. # 47.) Plaintiff filed a Reply Memorandum on September 30, 2011. (D.E. # 50.) For the reasons set forth below, Plaintiff's Second Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

On August 12, 2009, Plaintiff filed a Complaint against Defendants asking this Court to enforce collection of the indebtedness due Plaintiff under four commercial mortgage notes (the "Four Notes") and various limited continuing guaranties (the "Guaranties") executed by Defendants. (Compl. ¶ 7.) In the Complaint, Plaintiff sought a judgment against Labry, Benton, and Adams in the principle amount of $1,116,000.00, plus, jointly and severally with all other Defendants, one hundred percent (100%) of all interest, costs, and reasonable attorneys' fees.

1

(*Id.* at 8.)  Plaintiff filed its first Motion for Summary Judgment on May 11, 2010 (D.E. # 15-16.)

After the parties filed a response, reply, and sur-reply, the Court entered an order denying

Plaintiff's Motion on March 29, 2011.  (D.E. # 33.)

The Court held a hearing on the parties' Motion to Continue Trial (D.E. # 52) on

February 28, 2012.  At that hearing, the Court discussed Plaintiff's Second Motion for Summary

Judgment.  Plaintiff indicated that it had intended to include documents related to an additional

lawsuit in Florida ("the Florida Lawsuit") in its Second Motion.  In light of this revelation, the

Court granted Plaintiff ten days to file supplemental briefing so that Plaintiff would have ample

opportunity to present the Court with all of the information it would need for its decision.

Plaintiff did so on March 9, 2012.  (D.E. # 56.)  Similarly, the Court gave Defendants ten days to

respond to Plaintiff's supplemental briefing.

Although the Court denied Plaintiff's First Motion for Summary Judgment, the Court

interpreted the Guaranties and found that "full payment" under them included "thirty percent

(30%) of all of the 'Obligations' (the liabilities of Borrower to Bank, interest, attorneys' fees,

expenses of collection and costs) and thirty percent (30%) of the attorneys' fees, expenses of

collection, and costs owed by Guarantor for the enforcement of the Guaranties."  (Order, D.E. #

33, at 21.)  The Court further noted that "if the provisions of the Guaranties are not met, liability

may be apportioned jointy and severally between Labry, Benton, and Adams for the full payment

of the Obligations at the discretion of Plaintiff.  (*Id.* at 22.)  Similarly, the Court interpreted the

limitation clause to apply to interests, costs, and reasonable attorneys' fees, meaning that

"Plaintiff may recover no more than thirty percent (30%) of all interest, attorneys' fees, expenses

of collection, and costs.  Therefore, if the provisions of the Guaranties were not met, Defendants

would be jointly and severally liable for thirty percent (30%) of all interest, attorneys' fees, expenses of collection, and costs.  (*Id.*)  Under the law of the case, this interpretation will control the Court's evaluation of Plaintiff's Second Motion for Summary Judgment.

The following facts are undisputed for purposes of this Motion unless otherwise noted. Plaintiff is the owner and holder of the Four Notes, which are outstanding as of June 17, 2008. (Pl.'s Statement of Facts ¶ 1.)  Plaintiff asserts that Defendants "jointly and severally guaranteed the Four Notes such that they are jointly and severally liable for thirty percent (30%) of the principal amount of obligations outstanding under the Four Notes as of June 17, 2008, plus interest, attorneys' fees, and other fees and charges."  (*Id.* ¶ 2.)  Defendants note that while they did execute the Guaranties, reproduced in pertinent part below, they are not liable for any funds, as they raise affirmative defenses which they believe will block Plaintiff from recovering any sums from them.  (Defs.' Resp. to Pl.'s Statement of Facts ¶ 1-2.)

Different limited liability companies ("LLCs") executed each of the Four Notes.  (Pl.'s Statement of Facts ¶ 3.)  These LLCs include AB7G, LLC ("AB7G"), AB8G, LLC ("AB8G"), AB9G, LLC ("AB9G"), and AB10G ("AB10G") (collectively "the Borrower Entities").  (*Id.*) The Borrower Entities are all Florida LLCs domiciled in and engaging in business in the state of Florida. (*Id.* ¶ 4.)

Below is a description of each of the Four Notes:[1]

<u>Note 1</u>

---

[1]     In each of the Four Notes, Whitney National Bank ("Whitney") is the designated lender. Whitney assigned its interest in the Four Notes to Plaintiff, and Plaintiff was substituted as a party in this case in lieu of Whitney on May 6, 2011.  (D.E. # 41.)

To evidence a loan of $1,080,000.00, AB7G executed a Promissory Note dated October 24, 2005, in the original principal amount of $1,080,000.00, payable to the order of Whitney, as modified by that certain Change in Terms Agreement, dated October 24, 2006, executed by AB7G, in the original principal amount of $1,080,000.00, payable to the order of Whitney, as further modified by that certain Change in Terms Agreement, dated January 24, 2007, executed by AB7G, in the original principal amount of $1,080,000.00, payable to the order of Whitney, as further modified by that certain Changed in Terms Agreement, dated January 24, 2008, executed by AB7G, in the original amount of $1,080,000.00, payable to the order of Whitney.  (*Id.* ¶ 5.)

Note 2

To evidence a loan of $800,000.00, AB8G executed a Promissory Note dated October 24, 2005, in the original principal amount of $800,000.00, payable to the order of Whitney, as modified by that certain Change in Terms Agreement, dated October 24, 2006, executed by AB8G, in the original principal amount of $800,000.00, payable to the order of Whitney, as further modified by that certain Change in Terms Agreement, dated January 24, 2007, executed by AB8G, in the original principal amount of $720,000.00, payable to the order of Whitney, as further modified by that certain Changed in Terms Agreement, dated January 24, 2008, executed by AB8G, in the original amount of $720,000.00, payable to the order of Whitney.  (*Id.* ¶ 6.)

Note 3

To evidence a loan of $800,000.00 AB9G executed a Promissory Note dated October 24, 2005, in the original principal amount of $800,000.00, payable to the order of Whitney, as modified by that certain Change in Terms Agreement, dated October 24, 2006, executed by AB9G, in the original principal amount of $800,000.00, payable to the order of Whitney, as

further modified by that certain Change in Terms Agreement, dated January 24, 2007, executed

by AB9G, in the original principal amount of $720,000.00, payable to the order of Whitney, as

further modified by that certain Changed in Terms Agreement, dated January 24, 2008, executed

by AB9G, in the original amount of $720,000.00, payable to the order of Whitney.  (*Id.* ¶ 7.)

Note 4

To evidence a loan of $1,200,000.00 AB10G executed a Promissory Note dated October

24, 2005, in the original principal amount of $1,200,000.00, payable to the order of Whitney, as

modified by that certain Change in Terms Agreement, dated October 24, 2006, executed by

AB10G, in the original principal amount of $1,200,000.00, payable to the order of Whitney, as

further modified by that certain Change in Terms Agreement, dated January 24, 2007, executed

by AB10G, in the original principal amount of $1,200,000.00, payable to the order of Whitney,

as further modified by that certain Changed in Terms Agreement, dated January 24, 2008,

executed by AB10G, in the original amount of $1,200,000.00, payable to the order of Whitney.

(*Id.* ¶ 8.)

The Borrower Entities respectively breached certain terms and conditions of Note 1, Note

2, Note 3, and Note 4 when they failed to make the required payments respectively due upon

maturity of the Four Notes. (*Id.* ¶ 9.)  To date, the indebtedness under the Four Notes has not

been paid in full.  (*Id.* ¶ 10.)  Defendants are included in this matter as a result of the Guaranties

they each executed with respect to the Four Notes. (*Id.* ¶ 11.)

Plaintiff states that Labry "jointly and severally guaranteed thirty percent (30%) of the

obligations of Note # 1, Note # 2, Note # 3, and Note # 4, outstanding as of June 17, 2008 . . .

when he executed a Limited Continuing Guaranty for each of the Four Notes, all with effective dates of October 17, 2005 [(collectively "the Labry Guaranties")][.]" (*Id.* ¶ 12.)

Likewise, Plaintiff states that Benton "jointly and severally guaranteed thirty percent (30%) of the obligations of Note # 1, Note # 2, Note # 3, and Note # 4, outstanding as of June 17, 2008 . . . when he executed a Limited Continuing Guaranty for each of the Four Notes, all with effective dates of October 17, 2005 [(collectively "the Benton Guaranties")][.]" (*Id.* ¶ 13.)

And, lastly, Plaintiff states that Adams "jointly and severally guaranteed thirty percent (30%) of the obligations of Note #1, Note #2, Note #3, and Note #4, outstanding as of June 17, 2008, plus one hundred percent (100%) of all interest, attorneys' fees, and other fees and charges when he executed a Limited Continuing Guaranty for each of the Four Notes, all with effective dates of October 17, 2005 [(collectively "the Adams Guaranties")][.]" (*Id.* ¶ 14.)[2]

To each of these statements, Defendants admit that they each executed the Guaranties. However, Defendants again deny that Labry, Benton, and Adams are liable for the underlying debt. (Defs.' Resp. to Pl.'s Statement of Facts ¶ 12-14.) The Court notes that Labry, Benton, and Adams each individually signed four identical Guaranties for each of the Four Notes.

---

[2]      In Paragraphs 12-14, Plaintiff states that Labry, Benton, and Adams "jointly and severally guaranteed [to pay] one hundred percent (100%) of all interest, attorneys' fees, and other fees and charges" when they executed their respective Guaranties. (Pl.'s Statement of Facts ¶ 12-14.)  However, such an assertion is contrary to the Court's finding in its Order on Plaintiff's First Motion for Summary Judgment, in which the Court held that Defendants are jointly and severally liable to Plaintiff for no more than thirty percent (30%) of all interest, attorneys' fees, expenses of collection, and costs if they are in breach of the Guaranties. (Order, D.E. # 33, at 22.)  Furthermore, Defendants have correctly denied that they are liable for one hundred percent (100%) of all interests, attorneys' fees, and other fees and charges, although they appear to rely on their affirmative defenses for this denial rather than the Court's Order. Regardless, the Court will disregard this portion of Plaintiff's asserted facts.

6

On June 17, 2008, Plaintiff made demands upon Defendants for payment of their indebtedness due under the Four Notes.  (Pl.'s Statement of Facts ¶ 16.)  Plaintiff states that Defendants have failed to honor their respective obligations under the terms of the Labry Guaranties, Benton Guaranties, and Adams Guaranties by their failure to make the required payments and pay the outstanding balances due under the Four Notes, all as demanded by Plaintiff.  (*Id.* ¶ 17.)  In response, Defendants simply deny that they are liable to Plaintiff. (Defs.' Resp. to Pl.'s Statement of Facts ¶ 17.)

Plaintiff states that the total amount due on Note 1 is the principal amount of $1,080,000.00, plus accrued interest in the amount of $376,379.99 all as of the 27th day of April, 2010, with interest continuing to accrue on the unpaid principal balance from and after April 27, 2010, at the per diem rate of $540.00, plus appraisal fees of $125.  (Pl.'s Statement of Facts ¶ 18.)  Defendants admit that the principal amount of Note 1 is $1,080,000.00.  (Defs.' Resp. to Pl.'s Statement of Facts ¶ 18.)  Further, Defendants state that Plaintiff has charged the above stated interest and fees, but Defendants deny that they are liable to Plaintiff for these amounts. (*Id.*)

Plaintiff states that the total amount due on Note 2 is the principal amount of $720,000, plus accrued interest in the amount of $250,920.00, and late charges in the amount of $225.00, all as of the 27th day of April, 2010, with interest continuing to accrue on the unpaid principal balance from and after April 27, 2010 at the per diem rate of $360.00, plus appraisal fees of $125.  (Pl.'s Statement of Facts ¶ 19.)  Defendants admit that the principal amount of Note 1 is $720,000.00.  (Defs.' Resp. to Pl.'s Statement of Facts ¶ 19.)  Further, Defendants state that

Plaintiff has charged the above stated interest and fees, but Defendants deny that they are liable to Plaintiff for these amounts. (*Id.*)

Plaintiff states that the total amount due on Note 3 is the principal amount of $720,000.00, plus accrued interest in the amount of $250,920.00, and late charges in the amount of $225.00, all as of the 27th day of April, 2010, with interest continuing to accrue on the unpaid principal balance from and after April 27, 2010 at the per diem rate of $360.00, plus appraisal fees of $250. (Pl.'s Statement of Facts ¶ 20.) Defendants admit that the principal amount of Note 1 is $720,000.00. (Defs.' Resp. to Pl.'s Statement of Facts ¶ 20.) Further, Defendants state that Plaintiff has charged the above stated interest and fees, but Defendants deny that they are liable to Plaintiff for these amounts. (*Id.*)

Plaintiff states that the total amount due on Note 4 is the principal amount of $1,200,000.00, plus accrued interest in the amount of $418,199.99 and later charges in the amount of $10.00, all as of the 27th day of April, 2010, with interest continuing to accrue on the unpaid principal balance from and after April 27, 2010 at the per diem rate of $600.00, plus appraisal fees of $250. (Pl.'s Statement of Facts ¶ 21.) Defendants admit that the principal amount of Note 1 is $1,200,000.00. (Defs.' Resp. to Pl.'s Statement of Facts ¶ 21.) Further, Defendants state that Plaintiff has charged the above stated interest and fees, but Defendants deny that they are liable to Plaintiff for these amounts. (*Id.*)

Therefore, Plaintiff states that according to the Notes and the terms of the Labry, Benton, and Adams Guaranties, Defendants are indebted to Plaintiff, jointly and severally, in the principal amount of $1,116,000.00 plus interest, costs, and reasonable attorneys' fees. (Pl.'s Statement of Facts ¶ 22.) Defendants deny liability under the Labry, Benton, and Adams

8

Guarantees and argue that they "are not liable to repay the 'Obligations' [as defined in the Guaranties] [b]ecause of Plaintiff's breaches of the duty of good faith and fair dealing and failure to protect the collateral." (Defs.' Resp. to Pl.'s Statement of Facts ¶ 22.)

Defendants set forth the following additional statements of fact to which the Plaintiff did not directly respond. Defendants note that this lawsuit arises from financing transactions involving four separate undeveloped residential lots within the real estate development known as Alys Beach Subdivision in South Walton County, Florida ("Alys Beach") as follows: Lot 7 owned by AB7G; Lot 8 owned by AB8G; Lot 9 owned by AB9G; and Lot 10 owned by AB10G. (Defs.' Statement of Facts ¶ 1.) Defendants state that on or about October 24, 2005, the Borrower Entities acquired Alys Beach lots 7, 8, 9, 10 respectively (collectively, the "AB Lots"), from EBSCO Gulf Coast Development, Inc. ("EBSCO"). (*Id.* ¶ 2.) Defendants note that EBSCO is the developer of Alys Beach. (*Id.* ¶ 3.)

Defendants state that as of the date of the Borrower Entities' acquisition of the AB Lots, the Borrower Entities consisted of 474 Club, LLC ("474 Club"), holding a 30% membership interest in each of the Borrower Entities, and Mozaic Capital Partners II, LLC ("Mozaic"), holding a 70% membership interest in each of the Borrower Entities. The operating agreements for the Borrower Entities each identify Mozaic as the "Founding Member" and 474 Club as the "Investor." (*Id.* ¶ 4.) As of the date of the Borrower Entities' acquisition of the AB Lots, 474 Club consisted of two members: Labry and B&K Interests, LLC ("B&K"). (*Id.* ¶ 6.) The members of B&K are Adams and Benton. (*Id.*) As of the date of the Borrower Entities' acquisition of the AB Lots, Mozaic consisted of three members: Steven R. Bradley, Jon LaPlante and Brad Zeitlin (collectively the "Florida Guarantors"). (*Id.* ¶ 7.)

9

Defendants submit that they had no involvement in the negotiation with EBSCO culminating in the acquisition of the AB Lots by the Borrower Entities or in the negotiation with Plaintiff for the purchase money financing of the AB Lots. (*Id.* ¶ 8.) Defendants did not review or approve any commitment letter issued by Plaintiff. (*Id.*) Moreover, Defendants do not recall any occasion in which they received any communication directly from Plaintiff, in writing, by telephone or otherwise in advance of the closing of the AB Lots. (*Id.*) All negotiations with EBSCO and Plaintiff prior to the acquisition of the AB Lots and the closing of the Plaintiff's loan were handled by one or more of the members of Mozaic. (*Id.* ¶ 9.)

One or more members of Mozaic provided copies of the Borrower Entities' operating agreement to Plaintiff in advance of the loans being made. (*Id.* ¶ 12.) Section 3.8 of those operating agreements states:

> 3.8 *Loan Guarantys.* To the extent that any financing agreement with respect to the Project requires guarant[ie]s of the members, then each Member agrees to and shall execute appropriate guaranty agreements acceptable to the Company's lenders of the indebtedness; provided however, Investor [474 Club] shall in no event be obligated to guaranty any portion of the Company's indebtedness in excess of Investor's Percentage.

(*Id.* ¶ 14.)

Defendants understood, just as the operating agreements provide, that the Defendants' collective obligation under any guaranty documents required to be signed to secure the Plaintiff loans to the Borrower Entities would not exceed thirty percent (30%) of the Borrower Entities' obligations to Plaintiff, corresponding to Defendants collective indirect ownership of the Borrower Entities through 474 Club's thirty percent (30%) membership interest in the Borrower Entities. (*Id.* ¶ 15.) This understanding corresponds to the Courts' findings in its Order on Plaintiff's First Motion for Summary Judgment.

On or about October 12 or 13, 2005, Mozaic asked Defendants to sign the originals of the thirty percent (30%) Guaranties.  (*Id.* ¶ 16.)  Defendants delivered the signed guaranties to Mozaic for simultaneous presentation at the closing of the acquisition of the AB Lots and the closing of the purchase money financing by Plaintiff.  (*Id.* ¶ 18.)  Defendants state that Whitney's preparedness "to underwrite the credit facilities relying on the credits of the Tennessee Guarantors for a collective thirty percent (30%) of the exposure . . . indicated to the Tennessee Guarantors that Whitney had confidence in its underlying real estate collateral and the management skills of Mozaic and the Florida Guarantors."  (*Id.* ¶ 19.)  In signing and delivering the Guaranties, Defendants understood that the underlying land and any improvements thereon would be security for the Borrower Entities' obligations to Plaintiff such that if the Borrower Entities defaulted on their loans, the underlying real property collateral could be liquidated to discharge the Borrower Entities' obligations in whole or in part.  (*Id.* ¶ 21.)

Defendants state that in signing and delivering the Guaranties and in participating in 474 Club, as the "Investor" in Borrower Entities, Defendants understood that the underlying real property collateral was marketable in all respects.  (*Id.* ¶ 22.)  Defendants highlight that in court filings on a separate matter, EBSCO has taken the position that the title to the AB Lots is subject to a two-year build out covenant that runs with the land that entitles EBSCO to impose certain fines and penalties upon the Borrower Entities and any subsequent purchaser, accruing monthly for so long as the AB Lots are not developed following the expiration of the initial two year period.  (*Id.* ¶ 23.)  The fines purportedly running with the land on the AB Lots total $1,561,000 and are increasing at the rate of $48,500 per month.  (*Id.* ¶ 24.)  The two-year build out covenant is not binding upon a subsequent purchaser acquiring the AB Lots at a foreclosure sale;

11

therefore, upon the foreclosure of the AB Lots, all of the claimed fines and penalties would be canceled.  (*Id.* ¶ 25.)

In court filings in a separate matter, EBSCO also takes the position that the title to the AB Lots is subject to a covenant that runs with the land entitling EBSCO to repurchase the AB Lots at ninety percent (90%) of the then current market value, and that such covenant is also binding upon any subsequent purchaser from the Borrower Entities, resulting in such purchaser being required to sell the AB Lots for ten percent (10%) less than the price paid by such purchaser to the Borrower Entities.  (*Id.* ¶ 26.)

According to the Defendants, the repurchase covenant is not binding upon a subsequent purchaser acquiring the AB Lots at a foreclosure sale; therefore, upon the foreclosure of the AB Lots, such repurchase covenant would have no further effect upon the title to the AB Lots.  (*Id.* ¶ 27.)  The AB Lots are encumbered with mortgages or deeds of trust entitling Plaintiff to foreclose the AB Lots.  (*Id.* ¶ 28.)  The AB Lots are not marketable by the Borrower Entities so long as the restrictive covenants remain in place.  (*Id.* ¶ 29.)  The Florida Guarantors and AB9G had the lots appraised by Jason Shirley ("Shirley"), a professional appraiser in Florida.  (*Id.* ¶ 30.)  Shirley opined that:

> While I assert no opinion as to the legality of the ability to penalize future purchasers of the Lots via levying various "fines" or EBSCO's ability to repurchase the lots from future purchasers at less than fair market value, clearly should these be determined to be enforceable against future purchasers, the marketability of the Lots is significantly affected to the point of making the Lots unmarketable to third party purchasers. . . .

(*Id.* ¶ 32.)

Defendants assert that the marketability of the AB Lots would be significantly improved upon Plaintiff's exercise of its right to foreclose and sell the land, thereby insuring the recovery

of the Plaintiff's loans, in whole or in part.  (*Id.* ¶ 33.)  And, by electing to forego foreclosure, Defendants state that Plaintiff has intentionally left the impairments in place resulting in serious prejudice to the interests of the Defendants.  (*Id.* ¶ 36.)  Defendants submit that Plaintiff had actual knowledge of three things: (1) that the restrictive covenants encumbered the Borrower Entities' title to the AB Lots; (2) that the restrictive covenants materially impaired the marketability of the AB Lots; and (3) that Plaintiff, through foreclosure, had the legal right to remove this impairment to marketability.  (*Id.* ¶ 34.)  Furthermore, Defendants believe that if Plaintiff had timely initiative foreclosure proceedings against the AB Lots, "the expected recovery would be substantially greater considering the plummeting real estate values in Florida and the economic effects of the BP oil spill in the Gulf of Mexico.  (*Id.* ¶ 35.)  Accordingly, Defendants conclude that Plaintiff has not acted reasonably in dealing with Defendants and in handling the underlying collateral.  (*Id.* ¶ 38.)

Defendants state that Robbie Roberts ("Roberts") was Whitney's construction loan officer who signed the commitment letter for the AB Lots building project.  (*Id.* ¶ 10.)  He left Whitney's employment and currently works for EBSCO or in some capacity with EBSCO related to Alys Beach.  (*Id.* ¶ 11.)

The Court notes that neither party included the language of the Guaranties in their statement of facts; however, the Court finds it important to reproduce the relevant language of the Guaranties below.

<u>Limited Continuing Guaranty</u>

The undersigned (hereinafter sometimes referred to as "Guarantor", which term means individually, collectively, and interchangeably any, each and/or all of them) hereby gives to Whitney National Bank ("Bank") this Limited Continuing Guaranty (this "Guaranty") for the purpose of guarantying the obligations of [AB7G,

LLC and AB8G, LLC and AB9G, LLC and AB10G, LLC], a Florida limited liability company (hereinafter referred to as "Borrower", which terms means Individually, collectively, and interchangeably any, each and/or all of them). Guarantor agrees as follows:

1.      Guarantor jointly, severally and unconditionally guarantees to Bank the prompt payment in full of all obligations and liabilities of Borrower to Bank, direct or contingent, due or to become due, now existing or hereafter arising, including, without limitation, all future advances, with interest, attorneys' fees, expenses of collection and costs, and further including, without limitation, obligations to Bank on promissory notes, checks, overdrafts, letter-of-credit agreements, loan agreements, security documents, endorsements and continuing guaranties (collectively, the "Obligations"), plus attorneys' fees, expenses of collection and costs owed by Guarantor for the enforcement of, or related to, this Guaranty, but in no event shall Guarantor's liability under this Guaranty exceed THIRTY PER CENT (30%) of the principal amount of the Obligations outstanding at the time that Bank first gives written notice of default to Borrower on any of the Obligations, plus interest, attorneys' fees, and other fees and charges owed by Borrower to Bank on the Obligations plus attorneys' fees, expenses of collection and costs owed by Guarantor for the enforcement of, or related to, this Guaranty. Parties obligated on the Obligations are referred to herein as "Obligor", which term means individually, collectively, and interchangeably any, each and/or all of them.

5.      If this Guaranty is executed by more than one person, each person is bound by all of the provisions of this Guaranty and is jointly and severally liable for the payment in full of the Obligations up to the full amount of this Guaranty as if such person was the only person executing this Guaranty.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that the

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[3]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most

favorable to the nonmoving party.[4]  When the motion is supported by documentary proof such as

---

[3]      Fed. R. Civ. P. 56(a).

[4]      *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[5]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[6]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[7]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[8]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[9]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [its] asserted causes of action."[10]

## ANALYSIS

---

[5]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[6]     *Matsushita*, 475 U.S. at 586.

[7]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[8]     *Id.* at 251-52 (1989).

[9]     *Celotex*, 477 U.S. at 322.

[10]     *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

To begin, the Court notes that it has jurisdiction over this case pursuant to 28 U.S.C. § 1332.  The Guaranties at issue specify that they are to be governed and interpreted by Florida law.[11]  Consequently, the Court will apply the substantive law of Florida in this matter.[12]

In their filings, the parties raise three issues for the Court to address: Defendants' liability under the Guaranties, whether Plaintiff breached its duty of good faith and fair dealing and its duty to protect the collateral so as to relieve Defendants of liability under the Guaranties, and the need for additional discovery.  The Court will address each of these issues in turn.

<u>**Liability of Defendants under the Guaranties**</u>

In its Motion, Plaintiff points out that it is undisputed that Defendants executed the Guaranties securing the debt of the Borrower Entities under the Four Notes.[13]  It argues that the Guaranties are valid and enforceable and that as guarantors, Defendants are liable to Plaintiff in its role as guarantee.[14]  Furthermore, Plaintiff avers that no genuine issues of material fact exist as to whether Defendants breached the Guaranties, as Defendants failed to pay Plaintiff under the Guaranties when the Borrower Entities defaulted on their payments.[15]  It submits that the Borrower Entities' default on the terms of the Four Notes gave Plaintiff the right to pursue Defendants for their obligations under the Guaranties.[16]

---

[11]    The Guaranties each specify that "[t]his Guaranty shall be governed and Interpreted under the internal laws of the State of Florida."  (*See* D.E. # 44-3 at 12, § 9.)

[12]    *See, e.g.*, *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

[13]    (Pl.'s Mot., D.E. # 44-1, at 7.)

[14]    (*Id.* at 8.)

[15]    (*Id.* at 9-10.)

[16]    (*Id.* at 10.)

In response, Defendants do not directly address Plaintiff's assertion that they failed to pay Plaintiff as provided in the Guaranties; instead, Defendants assert that they are not in breach of the Guaranties.  They argue that Plaintiff breached its obligations under the Four Notes and Guaranties before Defendants withheld payment because Plaintiff did not comply with its duty of good faith and fair dealing or its duty to mitigate damages by protecting the collateral.[17]  In reply, Plaintiff succinctly reiterates the undisputed facts pointing to Defendants' failure to pay as required by the Guaranties.  It argues that the Guaranties permit it to pursue Defendants for breach of contract in the event of their breach, and it does not require Plaintiff to foreclose on the AB Lots.[18]

The Court interpreted the Guaranties in its Order on Plaintiff's First Motion for Summary Judgment and held that Defendants would be jointly and severally liable for 30% of the outstanding balances of the Four Notes and 30% of the interest, attorneys' fees, expenses of collection, and costs if the provisions of the Guaranties are not met.  However, the Court withheld ruling on Plaintiff's Motion because Plaintiff's interpretation of the Guaranties and the Four Notes differed from the Court's findings.[19]  Here, the facts underlying Defendants' liability under the Guaranties are not in dispute.[20]  The Borrower Entities failed to pay Plaintiff under the

---

[17]    (Defs.' Resp., D.E. # 47, at 1-2.)

[18]    (Pl.'s Reply, D.E. # 50, at 1-2.)

[19]    (Order, D.E. # 33, at 22.)

[20]    The Court notes that Defendants do not dispute their liability under the Guaranties because of any conduct on their part or that of the Borrower Entities.  Rather, Defendants assert that they are not liable under the Guaranties because Plaintiff breached its implied duties to protect the collateral and to perform under the Guaranties and Four Notes with good faith and fair dealing.

Four Notes, and Plaintiff then turned to the Guaranties and pursued Defendants for the amount

they guarantied under the Guaranties in the event of the Borrower Entities' default.  Defendants

do not dispute that the debt underlying the Four Notes remains unpaid.  Furthermore, Plaintiff's

interpretation of the Guaranties and the Four Notes aligns with that of the Court.

Accordingly, the Court finds that the provisions of the Guaranties have not been met:

Defendants have not paid the amount they owe in light of the Borrower Entities' default.

Therefore, Defendants are jointly and severally liable for 30% of the outstanding balances of the

Four Notes and 30% of the interest, attorneys' fees, expenses of collection, and costs, and this

portion of Plaintiff's Second Motion for Summary Judgment is **GRANTED**.  However,

Defendants will be required to pay Plaintiff under the Guaranties only if Plaintiff did not breach

its duty of good faith and fair dealing or its duty to protect the collateral.

### Issue Preclusion

In its supplemental briefing, Plaintiff notes that the "Walton County, Florida Circuit

Court and the District Court of Appeal for the First District of Florida have already ruled in favor

of Plaintiff on the identical issues raised by counsel for both AB7G and the Florida

guarantors."[21]  Thus, Plaintiff raises the issue of collateral estoppel, which it seeks to use

offensively to prevent Defendants from succeeding on their affirmative defenses and raising the

same arguments put forth before the Florida courts.

In their Response, Defendants point out that they were dismissed from the Florida

Lawsuit "before any judgments were rendered and thus never had to brief or argue the defenses

---

[21]      (Pl.'s Supplemental Br., D.E. # 56, at 2.)

upon which they currently rely."[22]  They characterize the documents upon which Plaintiff relies as "bare bones," and they urge the Court to disregard them.[23]  Additionally, they assert that they have cited to additional Florida law establishing the duty to protect the collateral "over and above the contract."[24]

The Supreme Court has characterized collateral estoppel as "an essentially procedural concept."[25]  Issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."[26]  The Sixth Circuit has implied that which issue preclusion law to apply—federal or state—depends upon the forum of the previous issues' determination.[27]  Thus, because Plaintiff relies upon a judgment from the Florida Lawsuit to which Whitney, its predecessor in interest, was a party, the Court will apply Florida issue preclusion law.

---

[22]     (Defs.' Resp. to Supplemental Br., D.E. # 57, at 2-3.)

[23]     (*Id.* at 3.)

[24]     (*Id.* at 5.)

[25]     *Abbate v. United States*, 359 U.S. 187, 200 n.4 (1959) (discussing collateral estoppel's applicability to the Fifth Amendment's Double Jeopardy Clause).

[26]     *Gen. Elec. Med. Sys. Europe v. Prometheus Health*, 394 F. App'x 280, 283 (6th Cir. 2010).

[27]     *Id.* at 283 n.2.  In *Prometheus Health*, the Sixth Circuit identified two cases: *Aircraft Braking Sys Corp. v. Local 856, Int'l Union, United Auto., Aerospace and Agr. Implement Workers, UAW*, 97 F.3d 155, 161-62 (6th Cir. 1996), for the proposition that federal issue preclusion law applied to a prior federal judgment, and *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 367-68 (6th Cir. 2007), for the proposition that state issue preclusion law applied to determine whether to give preclusive effect to a prior state judgment.

In Florida, collateral estoppel "assigns a preclusive effect only to those issues actually and necessarily decided in the prior lawsuit."[28]  For issue preclusion to attach, the party advancing the doctrine must show four elements:

> (1) the issue in question is the same issue involved in the prior litigation; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment rendered in the prior action; and (4) the party against whom the doctrine is applied was fully represented in the prior action.[29]

Issue preclusion is characterized as offensive when plaintiffs assert the doctrine to preclude defendants from relitigating a claim or issue.[30]  Notably, Florida courts have "considered and rejected the application of collateral estoppel defensively, as well as offensively, unless the parties involved in both suits are the same (or their privies)."[31]  The U.S. Supreme Court has noted that trial courts have "broad discretion to determine when [offensive issue preclusion] should be applied."[32]

Here, the Court finds that Plaintiff has failed to satisfy the four elements required for the Court to apply offensive issue preclusion.  Although Defendants' affirmative defenses are the same as those litigated and briefed in the litigation between Plaintiff's predecessor in interest,

---

[28]    *Sea Quest Int'l, Inc. v. Trident Shipworks, Inc.*, 958 So. 2d 1115, 1120 (Fla. Dist. Ct. App. 2007).

[29]    *Id.* at 1121.

[30]    *Id.* at 1121 n.5.

[31]    *Dempsey v. Law Firm of Cauthen & Odham, P.A.*, 752 So. 2d 107, 109 (Fla. Dist. Ct. App. 2000) (citing *E.C. v. Katz*, 731 So. 2d 1268 (Fla. 1999); *Stogniew v. McQueen*, 656 So. 2d 917, 919-20 (Fla. 1995) ("[W]e are unwilling to follow the lead of certain other states and of the federal courts in abandoning the requirements of mutuality in the application of collateral estoppel."); *O'Brien v. Fed. Trust Bank F.S.B.*, 727 So. 2d 296 (Fla. Dist. Ct. App. 1999)).

[32]    *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979).

Whitney, the Court finds that Plaintiff has not demonstrated the final two elements.  First, the brevity of the Florida trial court's opinion, which merely stated that "[t]he equities of this cause are with Plaintiff and against AB7G [and the Florida Guarantors]," is insufficient for the Court to conclude that the affirmative defenses raised by the Florida Guarantors were "essential to the final judgment rendered."

Second, and more importantly, the parties now before the Court were not fully represented in the Florida Lawsuit.  Although Plaintiff is in privity with Whitney and thus qualifies as the same party before the Florida court, Defendants in this case are not identical to those present in the Florida Lawsuit.  The Florida defendants were the Florida Guarantors and one of the Borrower Entities; here, Defendants are the Tennessee Guarantors.  Furthermore, Defendants point out that they were dismissed from the Florida Lawsuit prior to the Florida defendants' assertion of the affirmative defenses currently before the Court.  Therefore, any judgment obtained before the Florida courts by Whitney against AB7G and the Florida Guarantors is not binding on Defendants before this Court, and Plaintiff cannot use offensive collateral estoppel to preclude Defendants from raising the same affirmative defenses.  Therefore, the Court will now turn to those affirmative defenses.

## Breach of the Duty of Good Faith and Fair Dealing

The covenant of good faith and fair dealing is implied in most contractual relationships.[33]  While it protects the reasonable expectations of the contracting parties, it is not an independent

---

[33]     *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1184 (Fla. Dist. Ct. App. 2000).

term within a contract, and as such, it cannot override an express contractual provision.[34]  Thus, Florida law requires a party to connect a breach of the duty of good faith and fair dealing to performance of a specific express contractual provision: "there can be no cause of action for a breach of the implied covenant 'absent an allegation that an express term of the contract has been breached.'"[35]  Therefore, the Court finds that under Florida law, the provisions of the contract at issue take on great significance when a party to the contract challenges the good-faith performance of another under those provisions.

Anticipating Defendants' argument, Plaintiff argues that it has not breached its duty of good faith and fair dealing.  Plaintiff states that its chosen course of action—suing Defendants for the indebtedness due under the Guaranties—is expressly provided for under the Guaranties.[36]  Plaintiff states that the absence of language requiring it to foreclose on the AB Lots precludes Defendants' arguments that Plaintiff somehow breached its duty of good faith and fair dealing.[37]  Plaintiff states that "the implied covenant of good faith and fair dealing does not override an express contractual provision in an agreement."[38]

---

[34]     *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 791 (Fla. Dist. Ct. App. 2005).

[35]     *Id.* at 792 (quoting *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001)).

[36]     (Pl.'s Mot., D.E. # 44-1, at 10.)

[37]     (*Id.* at 10-11.)

[38]     (*Id.* at 11.)

In response, Defendants acknowledge this assertion and note that the duty of good faith and fair dealing must relate to the performance of an express term of the contract.[39]  Defendants then tie their breach of good faith and fair dealing claim to Plaintiff's exercise of its discretion not to foreclose on the AB Lots and note that Plaintiff must have exercised its discretion "in good faith [in a way] reasonably calculated to protect the parties' reasonable contract expectations."[40]  Plaintiff explains that "the duty of good faith and fair dealing revolves around questions of . . . reasonableness" and frames the question before the Court as "whether [Plaintiff] acted reasonably in exercising its remedial options . . . ."[41]  Notably, Defendants point out that "[r]easonableness is ordinarily a question of fact inappropriate for summary judgment."[42]  In reply, Plaintiff reiterates that it has the right to pursue an action against Defendants for amounts unpaid under the Four Notes, and it does not have a duty to foreclose rather than pursue Defendants for the debt they promised to pay.[43]

In its Order Denying Plaintiff's First Motion for Summary Judgment, the Court noted that it did not have enough information to rule on the issue of "whether Plaintiff's refusal to foreclose impairs the collateral and, as such, is a breach of the duty of good faith and fair dealing."[44]  The Court ordered both parties to refile legible copies of the Four Notes and to re-

---

[39]    (Defs.' Resp., D.E. # 47, at 8.)

[40]    (*Id.* at 8.)

[41]    (*Id.* at 9.)

[42]    (*Id.*)

[43]    (Pl.s' Reply, D.E. # 50, at 3.)

[44]    (Order, D.E. # 33, at 16.)

brief the issue, and it noted that the parties did not cite to any specific language in the Guaranties or the Four Notes.

Now that Plaintiff's Second Motion for Summary Judgment is before the Court, the Court notes that the parties have complied with its first request: they have filed legible copies of the Four Notes and the Guaranties.  However, although Plaintiff again asserts that the Four Notes and the Guaranties contain express provisions regarding Plaintiff's option to choose between foreclosure and pursuing an action against Defendants, Plaintiff has still failed to cite to any specific language in the seventy-two pages submitted as exhibits to Plaintiff's Second Motion for Summary Judgment at D.E. # 44-3, 44-4, 44-5, and 44-6 in support of this assertion.

Despite this lack of guidance, the Court has been able to find several provisions which appear to support Plaintiff's claim.  Each of the Four Notes contains a list of events of default. The first event of default, listed at subsection (a), identifies an event of default as "the non-payment of any principal or interest on this Note on the date when due."[45]  An additional event of default which could be applicable to this case is subsection (h), which states that an event of default is "any default by the Obligor in the payment or performance of any material liabilities, indebtedness or obligations to any other creditor."[46]

A list of remedies follows the list of events of default, but none expressly present foreclosure as an alternative to suing Defendants.[47]  The Four Notes indicate that "at the option

---

[45]     (Pl.'s Mot., D.E. # 44-3, at 2.)  The Court notes that each of the Four Notes contain identical language; therefore, the Court's citation to only one of the Four Notes is not inappropriate.

[46]     (*Id.*)

[47]     (*Id.*)

of [Plaintiff], the full amount of this Note and all other obligations and liabilities, direct or

contingent, of Obligor to [Plaintiff] shall be immediately due and payable without notice or

demand."[48]  Following this sentence, the Four Notes contain a list of six options Plaintiff "may,

one or more times, in its sole discretion, without notice to or the consent of Obligor," pursue

"[w]ithout releasing or affecting any of its rights."[49]  Among those choices is Plaintiff's right to

"release, exchange, modify, or surrender in whole or in part [its] rights with respect to any

collateral for this Note."[50]

Furthermore, the various Change in Terms Agreements also contain a list of Events of

Default and a section delineating the Lender's Rights.[51]  Possible Events of Default include

Payment Default, which is defined as when "Borrower fails to make any payment when due

under the indebtedness."[52]  In the Lender's Rights section, the Change in Terms Agreements

indicate that "upon default, Lender may declare the entire unpaid principal balance under this

Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that

amount."[53]  The Limited Continuing Guaranty also provides that

> Guarantor jointly, severally, and unconditionally guarantees to [Plaintiff] the
> prompt payment in full of all obligations and liabilities of Borrower to [Plaintiff],

---

[48]    (*Id.*)

[49]    (*Id.*)

[50]    (*Id.*)

[51]    (*Id.* at 4-9.)  Although there are three Change in Terms Agreements in the record, the only terms which change with each version are the due date for the principal and interest and how the interest is calculated.

[52]    (*Id.* at 4.)

[53]    (*Id.*)

> direct or contingent, due or to become due, now existing or hereafter arising, including, without limitation, all future advances . . . . [Plaintiff] *may* proceed against Guarantor for the full amount of the obligations whether or not if shall have made demand on, and pursued remedies against, Borrower.[54]

Furthermore, the Limited Continuing Guaranty contains a list of options similar to that contained in the Four Notes.  Plaintiff "may, one or more times, in its sole discretion, without notice to or the consent of Guarantor or any other Obligor, take any one or more of" the listed options.[55] Plaintiff can exercise these rights "[w]ithout releasing or affecting Guarantor's obligations hereunder."[56]

Taking the language of the Four Notes and the Guaranties together, the Court finds that they do not contain a requirement for Plaintiff to foreclose.  Instead, they indicate that, if an Event of Default occurs, Plaintiff has the option to pursue either the Borrowing Entities or the Guarantors for the remaining payments under the Four Notes.  Therefore, the Court accepts Plaintiff's statement that "no language in the agreement . . . requires Plaintiff to foreclose on the properties."  The Court was unable to find any provision in the documents provided by Plaintiff which indicates that Plaintiff is required to foreclose upon the collateral, but it infers from the Notes and Guaranties' use of the permissive word "may" that foreclosure could be an alternative remedy to pursuing the Borrowers or Guarantors for the amount owed.

However, the Court finds Plaintiff's legal arguments unsupported by Florida law.  As discussed above, Florida law does not state that the duty of good faith and fair dealing overrides express contractual provisions; rather, any breach of that duty must be couched in the

---

[54]     (*Id.* at 10 (emphasis added).)

[55]     (*Id.* at 11.)

[56]     (*Id.*)

performance of an express contractual provision.  The Court interprets Defendants' arguments to state that Plaintiff's decision not to foreclose on the property—it its performance under the specific provisions discussed above—was reached in bad faith.  Such an argument fits squarely within the delineations of Florida law.

But the fallacy of Plaintiff's legal argument does not preclude a grant of summary judgment.  Plaintiff argued that it did not act in bad faith when it decided not to foreclose on the property, and Defendants have failed to present the Court with facts sufficient to create a dispute as to whether Plaintiff acted in bad faith when it elected to pursue them under the Guaranties. Therefore, the Court finds that Defendants have failed to create a genuine issue of material fact as to the issue of bad faith.  Furthermore, Defendants did not point the Court to a specific provision in the Notes or Guaranties which requires Plaintiff to foreclose.  The Court finds that absent a contractual provision requiring Plaintiff to foreclose, it appears that Plaintiff has reserved its right under the Notes and Guaranties to proceed as it chooses in the event of a default.  The Court will not rewrite the Notes and Guaranties, and it finds Defendants' arguments regarding the breach of Plaintiff's duty of good faith and fair dealing without merit.  Therefore, Plaintiff's Second Motion for Summary Judgment that it did not breach its duty of good faith and fair dealing is **GRANTED**.

### Breach of the Duty to Mitigate Damages by Protecting the Collateral

Florida law requires each party to a contract to attempt to mitigate its damages.[57]  In Florida, banks cannot sue guarantors if the banks fail to properly perfect security interests in the

---

[57]     *See Associated Hous. Corp. v. Keller Bldg. Prods. of Jacksonville, Inc.*, 335 So. 2d 362, 364 (Fa. Dist. Ct. App. 1976).

collateral that is the subject of the guaranty at issue,[58] nor can a creditor deal with a debtor in such a way as to cause harm to the guarantor's interest.[59]   The duty to protect collateral generally arises in cases involving security interests under Article 9: "once the secured party repossesses collateral to secure payment of the debt after default, that party is under a duty of care to protect and preserve the collateral and dispose of it in a manner likely to bring the full fair value."[60]   If the creditor fails to protect the collateral by failing to perfect its security interest, such as failing to re-file a claim of lien, a guarantor can be released from his liability to the extent he was damaged by the loss of the collateral.[61]   However, for this duty to protect collateral to arise, a security interest must exist.  For a security interest to be created, the transaction at issue must be a secured transaction.

Defendants assert that Plaintiff owes them a duty to mitigate its damages by protecting the collateral.[62]   They cite to law stating that "if [a] bank allows the collateral [underlying a mortgage] to be impaired or lost, . . . the bank's right to enforce the guaranty can be

---

[58]    *See Baitcher v. Nat'l Indus. Bank of Miami*, 368 So. 2d 439, 440 (Fla. Dist. Ct. App. 1979) ("It is incumbent upon the Bank to take all normal precautions to perfect all security interest[s] in the fork lifts.  Failure to properly preserve the collateral justifies a release of the guarantor to the extent that he was damaged by the loss of the collateral.).

[59]    *See Dorsy v. Md. Nat'l Bank*, 334 So. 2d 273, 274 (Fla. Dist. Ct. App. 1976) (holding that a creditor impermissibly interfered with a guarantor's interest when it took over the debtor yacht company for its own benefit, caused the company's financial failure, and improperly conducted a sale resulting in a substantial financial loss and insufficient funds to pay the underlying obligations).

[60]    *Allen v. Coates*, 661 So. 2d 879, 883 (Fla. Dist. Ct. App. 1995).  The collateral must be protected in this regard to "prevent the creditor from acquiring the collateral at less than its true value or unfairly understating its value so as to obtain an excessive deficiency judgment."  *Id.*

[61]    *Boneh, Inc. v. Daly*, 743 So. 2d 542, 543 (Fla. Dist. Ct. App. 1999).

[62]    (Defs.' Resp., D.E. # 47, at 6.)

extinguished."[63]  Defendants argue that "[t]hose who loan money which is secured by real estate have a right to rely upon the existence of the real estate to support the repayment of that loan. Similarly, those who guaranty a loan which is backed by real estate have a right to either have the loan fully or partially satisfied by the sale of the land or have their own right to sell the land to fully or partially satisfy their own payments of the guarant[i]es."[64]  Defendants equate Plaintiff's refusal to foreclose on the AB Lots to a breach of its duty not to encumber the land, thereby leaving Defendants with no option for partial or full satisfaction of the Guaranties. Defendants point to the significant unmarketability of the AB Lots and note that "[a]ll that is required to render the property marketable again is [Plaintiff] exercising its right to foreclose on the underlying property."[65]  Defendants rely on their continual refrain as follows: "If the lots are foreclosed, the fines are wiped away; the lots are not subject to the repurchase[,] and the two-year build out period starts again."[66]  In its Reply, Plaintiff fails to directly address this argument.

The Court notes that the cases upon which Defendants rely indicate that a bank's failure to properly perfect or maintain a security interest in collateral prohibits the bank from seeking enforcement of a guaranty on that collateral.  Moreover, based on the Four Notes, they are "secured by a Mortgage and Security Agreement . . . guaranteed by Borrower affecting the property located at Alys Beach subdivision in Walton County, Florida, as more fully described in

---

[63]     (*Id.*)

[64]     (*Id.* at 7.)  The Court notes that Defendants do not cite any case law for this proposition.

[65]     (*Id.* at 8.)

[66]     (*Id.* at 4.)

the Mortgage."[67]  Although the parties have not provided the Court with a copy of this mortgage, the Court finds that Plaintiff has a security interest in, and a duty to protect, the collateral.

However, the Court finds that Plaintiff has not failed to protect the collateral.  Neither party has indicated that the AB Lots have been destroyed or have ceased to exist.  Moreover, Plaintiff did not cause the AB Lots' alleged unmarketability; Defendants, the Florida Guarantors, and the Borrower Entities failed to build on the AB Lots within two years, thereby incurring the fines which Defendant allege render the property unmarketable.  Therefore, Plaintiff did not cause the fines to accrue, and it has no duty to remove the fines through foreclosure.  The two-year build out requirement was a term the Guarantors and Borrower Entities agreed to when they signed the Guaranties and the Four Notes, and Defendants' failure to comply with that requirement, thereby allowing fines to attach to the AB Lots, does not result in Plaintiff's failure to protect the collateral by not removing the fines.  Defendants would have the Court rewrite the Notes and Guaranties to remove the fines, but the Court declines to do so.  Therefore, the Court finds that Plaintiff has not breached any duty it has to properly protect the AB Lots, and Plaintiff's Second Motion for Summary Judgment is **GRANTED**.

### Defendants' Need for Additional Discovery

Defendants requested the Court to delay its evaluation of Plaintiff's Second Motion for Summary Judgment under Rule 56(f), which the Court interprets as Rule 56(d).  Rule 56(d) provides in pertinent part that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to

---

[67]        (Pl.'s Mot., D.E. # 44-5, at 1.)

take discovery; or (3) issue any other appropriate order."[68]  However, at the Court's hearing on February 28, 2012, counsel for Defendants indicated that he did not require additional discovery on the facts currently before the Court.   Therefore, the Court finds that Defendants' assertions in court, combined with the amount of time which has passed since Defendants' filing of the Rule 56(d) affidavit on September 12, 2011, render Defendants' Rule 56(d) Affidavit **MOOT**.

## Damages, Attorney's Fees, and Costs

Because the Court has found that neither of Defendants' asserted affirmative defenses absolve them from their failure to pay the amount due under the Four Notes and Guaranties, the Court finds that Defendants have not paid the amount they owe in light of the Borrower Entities' default.  Therefore, Defendants are jointly and severally liable for 30% of the outstanding balances of the Four Notes and 30% of the interest, attorneys' fees, expenses of collection, and costs.

The Court notes that Plaintiff requested "a judgment, jointly and severally, against [Defendants] in the principal amount of $1,116,000.00, plus, jointly and severally, thirty percent (30%) of all interest, costs, and reasonable attorney's fees."[69]  Plaintiff did not attach documentation substantiating the dollar figure it alleges is outstanding on the Four Notes.  Therefore, Plaintiff shall submit within thirty (30) days of this Order a Motion for Damages, Attorney's Fees, and Interest, and Costs.  Defendants shall then have thirty (30) days following

---

[68]     Fed. R. Civ. P. 56(d).  The Sixth Circuit has noted that "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f).  A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary judgment motion."  *Siggers v. Campbell*, 652 F.3d 681, 696 (6th Cir. 2011).

[69]     (Pl.'s Mot. for Summ. J., D.E. # 44, at 2.)

the filing of Plaintiff's Motion to respond.  The Court will then determine the amount of damages, interest, attorney's fees, and costs to be awarded.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Second Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**s/S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 23, 2012.